UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

MARTIN S. MALINOU,
Appellant,
-vs-

SEATTLE SAVINGS BANK,
Appellee.

Civil Docket No. 06-544-S-DLM

On Appeal From United States Bankruptcy Court

BRIEF FOR THE APPELLANT

MARTIN S. MALINOU, Pro Se
Appellant
334 Smith Street
Providence, RI 02908
Telephone (401) 331-6554

February 2, 2007

TABLE OF CONTENTS

| | Page |
|---|---|
| Basis Of Appellate Jurisdiction | 1 |
| Issues Presented/Standard Of Appellate Review | 2 |
| Statement Of The Case | 3 |
| Arguments | 7 |
| I The Bankruptcy Court Arbitrarily Conducted An Emergency Hearing On December 13, 2006, On Motion Of Appellee Seattle Savings Bank To Lift The Automatic Stay To Allow "Seattle" To Conduct A Mortgagee's Sale Of Appellant's Home And Arbitrarily Denied Appellant A Continuance Of The Appellee's Emergency Motion For Relief From Stay | 7 |
| II The Mortgagor Is Entitled To Pay Off The Mortgage Note In Full With A Payment Of 95% Of The Fair Market Value Of Appellant's Real Estate As A Single Family Home As Determined By The United States Department Of Housing And Urban Development | 8 |
| Conclusion | 13 |
| Appendix -Home Equity Conversion Loan Agreement | 14 |

CASES CITED

| | |
|---|---|
| Re American Mariner Industries, Inc., 734 F 2d 426 (CA 9 Cal 1984) | 1 |
| Richmond Leasing Co. v. Capital Bank, N.A. (1985, CA 5 Tex) 732 F 2d 1303, 1307, 12 CBC 2d 1202 | |

# STATUTES AND RULES


| | Page |
|---|---|
| 28 USC 1334 | 1 |
| 28 USC 157(a) | 1 |
| 28 USC 151 | 1 |
| 28 USC 158(c)(1) | 1 |
| 11 USC 362(a)(1) | 7 |
| 11 USC 362(d) | 7 |
| 24 CFR 206.125 (1991) | 5 |
| 24 CFR 206.125(b) (1991) | 11 |
| 24 CFR 206.125(c) (2006) | 12 |
| 54 FR 24833 | 8, 12 |
| 54 FR 32060 | 11, 12 |
| Bankruptcy Rule 8001(e) | 1 |
| Bankruptcy Rule 9014 | 7 |
| Bankruptcy Rule 9014(a) | 7 |
| Local BaNkruptcy Rule 4001-1(c) | 7 |
| LR Gen 109 | 1 |
| Housing and Community Development Act of 1987 (Pub.L. 100-242) | 8 |
| Sec. 255 National Housing Act (12 USC 1715z-20) | 5, 8 |

BASIS OF APPELLATE JURISDICTION

The district court is granted jurisdiction over matters relating to bankruptcy by virtue of 28 USC Sec. 1334. Pursuant to 28 USC Sec. 157(a) the district court may refer matters for consideration to the bankruptcy judges, who are to act as a "unit" of the district court. 28 USC Sec. 151. This district court has adopted a rule referring bankruptcy cases and proceedings to the bankruptcy judge of this district. LR Gen 109. 28 USC 158(a) provides the district court (or appellate panel) with jurisdiction to hear appeals from all final judgments, orders, and decrees of the bankruptcy judge. An appellant may elect to have his appeal heard by the district court. 28 USC 158(c)(1). The election requires a statement of the election contained in a writing separate from the notice of appeal. Bankruptcy Rule 8001(e).

On December 11, 2006, Appellant filed a voluntary chapter 13 case in United States Bankruptcy Court for the District of Rhode Island. (Record Appendix, docket p. 1, doc. #1) On December 15, 2006, the Bankruptcy Court entered the Judgment Order (Record Appendix, docket p.4, doc. #20) appealed from -lifting the automatic stay on motion of Appellee SEATTLE SAVINGS BANK to allow a mortgagee's sale of Appellant's home. On December 15, 2006, Appellant filed his Notice of Appeal (Appx., docket p. 4, doc. #21), together with his statement of election (Appx., docket p. 4, doc. 22) to have his appeal heard by the district court.

The judgment order appealed -granting relief from the automatic stay- is a final order. Re American Mariner Industries, Inc., 734 F 2d 426 (CA 9 Cal 1984)

## ISSUES PRESENTED

I

Did the Bankruptcy Court arbitrarily conduct an emergency hearing on December 13, 2006, on the motion of appellee SEATTLE SAVINGS BANK to lift the automatic stay to allow "Seattle" to conduct a mortgagee's sale of appellant's home and arbitrarily deny continuing its EMERGENCY MOTION?

Appellant answers in the affirmative. The standard for appellate review is de novo since the bankruptcy court made a legal determination to grant an expedited hearing without a finding that an emergency existed. (transcript, p. 9)

II

Is the mortgagor entitled to pay off the mortgage note in full with a payment of 95% of the fair market value of appellant's real estate as a single family home as determined by the Department of Housing and Urban Development?

Appellant answers in the affirmative. The standard for appellate review is de novo since the answer requires an interpretation of a federal regulation published in the Federal Register.

STATEMENT OF THE CASE

This is an appeal from a final judgment order entered by the United States Bankruptcy Court lifting so much of the automatic stay as will allow the appellee SEATTLE SAVINGS BANK to conduct a mortgagee's sale of real estate located at 334 Smith Street, Providence, Rhode Island, the home and office of appellant MARTIN S MALINOU who filed a voluntary chapter 13 petition on December 11, 2006, and thereby stayed the mortgagee's sale which had been advertised for December 12, 2006. Appellant elected to bring his appeal to the district court.

On the date Appellant filed his petitionthe appellee SEATTLE SAVINGS BANK filed a Motion for relief from the automatic stay and a Motion to expedite the hearing. (Bankruptcy docket, p. 2) The motion for an expedited hearing was scheduled for 10 A.M. on December 13, 2006. On December 13, 2006, the bankruptcy court conducted a hearing, granted the motion to expedite and granted relief from the automatic stay. (Bankruptcy docket, p. 3) Appellant had objected to the proceedings for the reason that no emergency existed and he needed a meaningful opportunity to prepare a response and obtain testimony of witnesses. (transcript, p. 7) Appellant requested a continuance to authenticate documentary evidence (transcript, p. 22, p. 17), including HUD Handbooks (transcript, p. 24-25). The court denied the request for a continuance. (transcript, p. 25)

During the hearing Appellant argued that the mortgagor was entitled to pay off the mortgage note in full with a payment of 95% of the fair market value of the real estate as a single family home as determined by the Department of Housing and Urban Development. The bankruptcy court listened but did not rule on the argument. (transcript, pp. 9-10)

Seattle's counsel brought the mortgage documents to the proceedings leading to the judgment appealed from; counsel did not attach those papers to Seattle's EMERGENCY MOTION FOR RELIEF FROM STAY (Bankruptcy doc.#6). Seattle's counsel told the bankruptcy court:

> "... And, Your Honor, by the way, I do have the note and mortgage. Mr. Malinou has seen these many times. If the Court would like me to enter these of record as exhibits, I'd be happy to." (transcript, p. 30)

Appellant questioned the completeness of the loan documents:

> "MR. MALINOU: There may be another document there.
>
> THE COURT: A fourrth document you're --
>
> MR. MALINOU: Well, without seeing --
>
> THE COURT: There's a note, an amendment to the note and the mortgage." (transcript, p. 30)

A fourteen page "HOME EQUITY CONVERSION LOAN AGREEMENT" which is part of the loan documents was not presented by Seattle and is not included in the record on appeal. That document is mentioned in Seattle's EMERGENCY MOTION FOR RELIEF FROM STAY on page 1, numbered paragraph 1. Although the Loan Agreement is dehors the record the Appellant is attaching a copy for the purpose of appellate judicial notice of its provisions. In paragraph 6.4 of the Loan Agreement there is the following provision: "This Loan Agreement shall be governed by Federal law and the law of the jurisdiction in which the Property is located. ..."

The loan agreement referred to had been included in a list of full exhibits stipulated by Appellant and Seattle at the trial of a related case in the Rhode Island Superior Court: Malinou v. Seattle Savings Bank, No. 06-193 in Providence County before Judge Judith Savage. Appellee SEATTLE SAVINGS BANK submitted Judge Savage's decision to the bankruptcy court to show the record of the Superior Court. (transcript, p. 19) Judge Savage's decision is Seattle's exhibit #1.

## HOME EQUITY CONVERSION MORTGAGE (HECM)

The subject matter of this appeal is a Home Equity Conversion Mortgage (HECM) insured by the United States Department of Housing and Urban Development and governed by Section 206.125 Rules and Regulations enacted under section 255 of the National Housing Act (12 USC 1715z-20), published in the Federal Register, volume 54, No. 110 on June 9, 1989, codified at 24 CFR sec. 206.125 (1991). Appellee SEATTLE SAVINGS BANK claims to be the present holder of the non-recourse promissory note (labeled Home Equity Conversion Adjustable Rate Note with an Adjustable Allonge Amending Note) dated November 15, 1991 (appellee's exhibits 1 and 2), executed by the late Etta E. Malinou to the benefit of the Rhode Island Housing and Mortgage Finance Corporation, accompanied by a Home Equity Conversion Loan Agreement dated November 15, 1991 (dehors the record), between the late Etta E Malinou and the Rhode Island Housing and Mortgage Finance Corporation, and also accompanied by a mortgage dated November 15, 1991 (appellee's exhibit 4), from the late Etta E. Malinou to the Rhode Island Housing and Mortgage Finance Corporation wherein her real estate (her home) located at number 334 Smith Street in Providence, Rhode Island, designated as Assessor's Plat 67 on Lot 71, is described as security for the Note.

It is undisputed that Etta E. Malinou died testate on January 13, 2003,[1] and that the Appellant acquired title to the real estate and is its present owner under the provisions of her Will and is her son, and is her Executor. Her age was 94 years at the time of her death. She was born February 18, 1908.

---

[1] In a related case the Appellant is the plaintiff in a civil action brought against The Miriam Hospital and others for the wrongful death of his mother and her conscious pain and suffering. Martin Malinou, Individually and as Executor of the Estate of Etta E Malinou, etc. v. The Miriam Hospital, et al., RI Superior Court (Providence County), docket No. 06-286.

On March 14, 2006, the Appellant offered the appellee SEATTLE SAVINGS BANK 100% of the subject real estate's value as appraised by the United States Department of Housing and Urban Development in full payment of the mortgage note. (Appellant's exhibit C) The offer in writing was made through Appellee's counsel in a related case which was then pending in Rhode Island Superior Court for Providence County before Judge Judith Savage docketed number 06-193. The case is captioned "Martin Malinou, Individually and as Executor of the Estate of Etta E. Malinou, Plaintiff, -vs- Seattle Savings Bank, Defendant." Judge Savage's opinion and Judgment is a part of this record as Appellee's exhibit #1. Appellant's offer in writing was made through Appellee's counsel in that case and reads in part as follows:

> "In order to avoid further litigation the Estate of Etta E. Malinou has agreed to sell 334 Smith Street to me at 100% (not 95%) of its HUD appraised value as a single family residence (not its value as commercial real estate). The proceeds will pay off the HECM loan.
>
> "As executor of the Estate of Etta E. Malinou I request that you contact the HUD office to arrange the appraisal. The estate will pay for the appraisal as required by the regulations governing HECM properties involved in foreclosure proceedings.
>
> "I do not expect the residence appraisal to exceed one hundred thousand ($100,000) dollars, -an amount readily available to the estate as a seller.
>
> Of course, the estate must receive a marketable discharge of the HECM mortgage."

The letter is a part of this record as Appellant's exhibit C.

It is undisputed that on October 17, 2006, the appellee SEATTLE SAVINGS BANK made demand on the Appellant in his capacity as Executor of the Estate of Etta E. Malinou and Individually for payment in full under the Note in the amount of $291,297.82, plus attorneys fees and expenses and such other interest as it claims to continue accruing, and on November 20, 2006 and subsequent dates caused to be published a notice of MORTGAGEE'S SALE.

# A R G U M E N T S

## I

THE BANKRUPTCY COURT ARBITRARILY CONDUCTED AN EMERGENCY HEARING ON DECEMBER 13, 2006, ON THE MOTION OF APPELLEE SEATTLE SAVINGS BANK TO LIFT THE AUTOMATIC STAY TO ALLOW "SEATTLE" TO CONDUCT A MORTGAGEE'S SALE OF APPELLANT'S HOME AND ARBITRARILY DENIED APPELLANT A CONTINUANCE OF THE APPELLEE'S EMERGENCY MOTION FOR RELIEF FROM STAY.

The whole record contains no finding that an emergency situation existed nor does the record contain a scintilla of legally competent evidence that would support a finding that an emergency existed.

11 USC 362(a)(1) stays the commencement or continuation of actions against the Appellant which arose before the bankruptcy petition was filed. Section 362(d) allows the court to grant relief from the stay to a party in interest after notice and hearing. Rule 9014 of the Federal Rules of Bankruptcy Procedure governs contested matters with respect to motions for relief from the automatic stay. Rule 9014(a) provides that "In a contested matter ... relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought. ..." Local Bankruptcy Rule 4001-1 (c) allows a party opposing a motion for relief from the automatic stay at least ten (10) days to file an opposition, unless the court has scheduled an expedited hearing. The Appellant contends that no emergency was shown to warrant an expedited hearing which denied him a meaningful opportunity to prepare and present his defense to the appellee's emergency motion for relief. The appellant contends that the bankruptcy court determination that an expedited hearing should be granted is a legal determination subject to de novo review by the district court. See, Richmond Leasing Co. v. Capital Bank, N.A. (1985, CA5 Tex) 762 F 2d 1303, 1307, 12 CBC 2d 1202.

ARGUMENT II

THE MORTGAGOR IS ENTITLED TO PAY OFF THE MORTGAGE NOTE IN FULL WITH A PAYMENT OF 95% OF THE FAIR MARKET VALUE OF APPELLANT'S REAL ESTATE AS A SINGLE FAMILY HOME AS DETERMINED BY THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT.

By letter (Appellant's exhibit C) dated March 14, 2006, the appellant offered the appellee the subject real estate's value as appraised by HUD in full payment of the mortgage note. (The note and the amendment to the note are appellee's exhibits 2 and 3.) On October 17, 2006, the appellee SEATTLE SAVINGS BANK made demand on the Appellant in his capacity as Executor of the Estate of Etta E Malinou and Individually for payment in full under the note in the amount of $291,297.82, plus attorneys fees and expenses and such other interest as it claims to continue accruing. The appellant contends that the issue of whether the mortgagor is entitled to pay off the mortgage note in full with 95% of such lesser amount as HUD determines to be the value of his single family home is ripe for review. The appellant also contends that as Executor of his mother's estate he is also a mortgagor by definition contained in regulations enacted under section 255 of the National Housing Act. 54 FR 24833, June 9, 1989, as amended at 60 FR 42761, Aug. 16, 1995. Section 417 of the Housing and Community Development Act of 1987 (Pub.L.100-242) added a new section 255 to the National Housing Act (12 USC 1715z-20). Section 255 authorizes a program for the insurance of home equity conversion mortgages (also known as reverse mortgages) for elderly homeowners. The appellant also contends that the fair market value must be determined by HUD and not "SEATTLE". On March 20, 2006, the appellant delivered a letter (Appellant exhibit D) requesting appraisal to the local HUD office. That letter follows:

MARTIN MALINOU
Attorney-at-Law
334 Smith Street
Providence, Rhode Island 02908
Phone (401) 331-6554

March 20, 2006

Mr. Michael Dziok
U.S. Dept. Housing & Urban Dev.
121 South Main Street -3rd Floor
Providence, RI 02903

Dear Mr. Dziok:

A HECM loan was obtained in November, 1991, by my late mother Etta E. Malinou, on property located at 334 Smith Street, Providence. She died in January, 2003. As her executor I am a plaintiff in civil action 06-0193 now pending in RI Superior Court (Providence County) in which Seattle Savings Bank has been temporarily enjoined from foreclosing. It seeks more than a quarter million dollars. I believe the property value is not more than $100,000 as a single family residence. I request an appraisal to payoff the HECM balance at the lesser amount. I wish to involve the local HUD office in the payoff procedures as required by the HECM regulations and the HUD Handbooks. Seattle Savings Bank has taken the position that it can make all decisions for HUD, Fannie Mae, and the lender. My reading of the law (relevant pages of regulations and HUD Handbooks attached) does not allow such conflicts of interest. HUD has an independent role.

Regulations enacted under section 255 of the National Housing Act were published in the Federal Register volume 54, No. 110, on June 9, 1989. At page 24840 (copy attached) the mortgagor (defined to include the mortgagor's estate) may request an appraisal. Sec. 206.125(b). The HUD Secretary informs both parties in writing of the appraised value of the property. Sec. 206.125(b). The mortgagor may sell the property for at least the lesser of the mortgage balance or the appraised value. Sec. 125(c). The definition of mortgagor, including the mortgagor's estate, is provided in section 206.123(b) at page 24839 (copy attached). The estate will sell the property to me, individually.

HUD Handbook 4235.1 Rev-1 chapters 9-9 and 9-10 (which directs the local HUD office to follow the procedures contained in HUD Handbook 4330.1 Rev-5) elaborates on the regulations. Chapters 9-9 and 9-10 are attached (two pages of attachment) and deal with payoffs. The referenced chapter 13 of HUD Handbook 4330.1 Rev-5 at section 29 "Payoffs" is also attached (three pages of attachment). It reads in part: "The mortgagor or the mortgagor's estate may sell the property at any time for the lesser of: 1. The debt due under the mortgage, ... or 2. The appraised value at the time of the sale, as determined by the HUD office having jurisdiction over the property. The mortgagor may request an appraisal if he or she believes that the value of the property is less than the debt."

Your office, not the lender, should select the appraiser. Please let Seattle Savings Bank (which claims to be the present holder of the mortgage) know that you will make the selection. I will pay the appraisal fee.

The first name of the contact person at Seattle Savings Bank is Tiffany. She can be reached at (866) 863-5224 ext. 158. The bank's local counsel is Robert Landau, Esq., at Roberts, Carroll, Feldstein and Peirce. He can be reached at (401) 521-7000.

Very truly yours,

MARTIN MALINOU

MM/m
enclosures

BY FAX (401) 277-8398

HUD DETERMINES THE MARKET VALUE

The mortgage which is the subject matter of this case was executed on November 15, 1991. The regulation which applied to the mortgage in a foreclosure reads as follows in section 206.125(b):

> "(b) Appraisal. The property may be appraised upon the mortgagor's request at the time the mortgagor is sent the notice that the mortgage is due and payable, or in connection with a pending sale. The property shall be appraised no later than 15 days before a foreclosure. Whenever an appraisal is requested or required, the mortgagee shall notify the Secretary to cause an appraisal of the property to be made. The Secretary shall inform the mortgagee and the mortgagor in writing of the appraised value of the property. The appraisal shall be at the mortgagor's expense." 54 FR 24833, June 9, 1989; 54 FR 32060, Aug. 4, 1989; 24 CFR 291 (1991)

The foregoing section was applicable federal law at the time the mortgage was executed, and, appellant contends, continues to govern the contract rights of the mortgagor and mortgagee. The appellant must point out that section 206.125(b) has been amended and the Secretary is no longer under a duty to inform the mortgagor and mortgagee of the appraised value of the property.

Appellant requests the district court to take judicial notice of the Loan Agreement executed on November 15, 1991, as a part of the mortgage. A full copy is provided this court as an exhibit to his brief. In the hurried atmosphere of the proceedings appealed from the appellant did not realize that the Loan Agreement was omitted from the loan documents which appellee SEATTLE SAVINGS BANK was permitted to introduce as its exhibits. In paragraph 6.4 of the Loan Agreement there is the following provision: "This Loan Agreement shall be governed by Federal law and the law of the jurisdiction in which the Property is located. ..." Federal law existing at the time of the mortgage execution is thereby made part of the contract.

THE NOTE NEED NOT BE PAID IN FULL

The mortgagor is entitled to pay off the mortgage note in full with a payment of 95% of the fair market value of appellant's real estate as a single family home. The regulation which has applied to payoff of the mortgage note reads as follows in section 206.125(c):

> "(c) Sale by mortgagor. Whether or not the mortgage is due and payable, the mortgagor may sell the property for at least the lesser of the mortgage balance or the appraised value (determined under § 206.125(b)). If the mortgage is due and payable at the time the contract for sale is executed, the mortgagor may sell the property for at least the lesser of the mortgage balance or five percent under the appraised value. The mortgagee shall satisfy the mortgage of record ..." 54 FR 24833, June 9, 1989; 54 FR 32060, Aug. 4, 1989; 24 CFR 268 (2006).

The language is crystal clear. The regulation allows appellant as Executor of Etta E Malinou to sell the property interest of her estate in the realty to himself individually at the appraised value and pay off the mortgagee with 95% of the selling price. SEATTLE SAVINGS BANK has not and will not agree to accept 95% of the appraised value (nor 100% of the appraised value) of the property in full satisfaction of the mortgage.

Appellant has found no case law mentioning section 206.125(c) or a mortgagor's right to payoff a federal government insured reverse mortgage for less than the mortgage balance by calling for an appraisal that will serve to cap the payoff amount. HUD Handbooks -which are not part of this appellate record- do address that right of a mortgagor. If the appellant had been afforded a meaningful opportunity to prepare for the bankruptcy court hearing on appellee SEATTLE'S motion to lift the automatic stay to foreclose (EMERGENCY MOTION FOR RELIEF FROM STAY) or if his requests to continue the December 13, 2006 hearing had been granted, the HUD Handbooks would have been offered in evidence as appelant's exhibits. (See, e.g. transcript, pp. 7, 17, 22, 24, 25, especially at pp. 24-25.)

## CONCLUSION

For the reasons given and the authorities cited the Judgment Order of the United States Bankruptcy Court (Bankr. Doc. #20) entered on December 15, 2006, should be reversed, and foreclosure proceedings against the Appellant's real estate located at 334 Smith Street, Providence, Rhode Island, should be stayed during the pendency of the Appellant's Chapter 13 case, and the Appellee SEATTLE SAVINGS BANK should be ordered to accept 95% of the fair market value of said real estate as a single family residence as determined by HUD in full satisfaction of the mortgage note which it claims to hold from the mortgagor, and the Appellee should be ordered to accept the written appraisal to be submitted to it (and to the Appellant) as the present fair market value.

MARTIN S. MALINOU, Pro Se
Appellant
334 Smith Street
Providence, RI 02908
Telephone (401) 331-6554

February 2, 2007

HOME EQUITY CONVERSION LOAN AGREEMENT

This agreement is made this 15th day of November, 1991, among Etta E. Malinou ("Borrower") and Rhode Island Housing and Mortgage Finance Corporation ("Lender") and the Secretary of the Department of Housing and Urban Development ("Secretary").

Article 1 - Definitions

1.1. "Expected Average Mortgage Interest Rate" means the amount indicated on the attached payment plan (Exhibit 1). It is a constant interest rate used to calculate monthly payments to the Borrower throughout the life of the loan.

1.2. "Loan Advances" means all funds advanced from or charged to Borrower's account under conditions set forth in this Loan Agreement, whether or not actually paid to Borrower.

1.3. "Loan Documents" means the Note, Second Note, Security Instrument and Second Security Instrument.

1.4. "Maximum Claim Amount" means the lesser of the appraised value of the property or the maximum dollar amount for an area established by the Secretary for a one-family residence under section 203(b)(2) of the National Housing Act (as adjusted where applicable under section 214 of the National Housing Act). Both the appraised value and the maximum dollar amount for the area shall be as of the date the conditional commitment is issued. Closing costs shall not be taken into account in determining appraised value.

1.5. "Note" means the promissory note signed by Borrower together with this Loan Agreement and given to Lender to evidence Borrower's promise to repay, with interest, Loan Advances by Lender or Lender's assignees.

1.6. "Principal" or "Principal Balance" means the sum of all Loan Advances made as of a particular date, including interest and mortgage insurance premiums.

1.7. "Principal Limit" means the amount indicated on the attached payment plan (Exhibit 1) when this Loan Agreement is executed, and increases each month for the life of the loan at

a rate equal to one-twelfth of the sum of the Expected Average Mortgage Interest Rate and one-half of one percent. The Principal Limit is calculated by multiplying the Maximum Claim Amount by a factor supplied by the Secretary, which is based on the age of the youngest Borrower and the Expected Average Mortgage Interest Rate.

1.8. "Principal Residence" means the dwelling where the Borrower maintains his or her permanent place of abode, and typically spends the majority of the calendar year. A person may have only one principal residence at any one time. The Property shall be considered to be the Principal Residence of any Borrower who is temporarily or permanently in a health care institution as long as the property is the Principal Residence of at least one other Borrower who is not in a health care institution.

1.9. "Property" means Borrower's property identified in the First and Second Security Instruments.

1.10. "Second Note" means the promissory note signed by Borrower together with this Loan Agreement and given to the Secretary to evidence Borrower's promise to repay, with interest, Loan Advances by the Secretary secured by the Second Mortgage.

1.11. "Second Security Instrument" means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Second Note.

1.12. "Security Instrument" means the mortgage, deed of trust, security deed or other security instrument which is signed by Borrower together with this Loan Agreement and which secures the Note.

Article 2 - Loan Advances

2.1. General. Lender agrees to make Loan Advances under the conditions set forth in this Loan Agreement in consideration of the Note and Mortgage given by Borrower on the same date as this Loan Agreement.

2.2. Initial Advances.

2.2.1. Loan Advances shall be used by Lender to pay, or reimburse Borrower for, closing costs listed in the Schedule of Closing Costs (Exhibit 2) attached to and

made a part of this Loan Agreement, except that Loan Advances will only be used to pay origination fees in an amount equal to one percent (1%) of the maximum claim amount.

2.2.2. Loan Advances shall be used by Lender to discharge the liens on the property listed in the Schedule of Liens (Exhibit 2) attached to and made a part of this Loan Agreement.

2.2.3. Lender shall pay an initial Loan Advance to Borrower in the amount indicated on the attached payment plan (Exhibit 1).

2.2.4. Initial advances required by this Section 2.2. shall be made as soon as such advances are permitted by the applicable provisions of 24 CFR Part 226 (Truth in Lending) governing Borrower's right of rescission, but not before that time.

2.3. <u>Set Asides</u>.

2.3.1. Amounts set aside from the Principal Limit shall not be considered Loan Advances or bear interest except to the extent actually disbursed by Lender.

2.3.2. Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) for repairs to be made in accordance with a Repair Rider attached to and made a part of this Loan Agreement (Exhibit 3).

2.3.3. Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payments due for first year property charges consisting of taxes, hazard insurance, ground rents and assessments.

2.3.4. Lender shall initially set aside from the Principal Limit the amount indicated on the attached payment plan (Exhibit 1) to be applied to payment due for a fixed monthly charge for servicing activities of Lender or servicer. A servicing fee set aside, if any, is not available to the Borrower for any purpose, except to pay for loan servicing.

2.4. <u>Charges and Fees</u>. Borrower shall pay to Lender reasonable and customary charges and fees after endorsement as per-

mitted under 24 CFR 206.207. Such amounts shall be considered Loan Advances when actually disbursed by Lender.

2.5. <u>Monthly Payments</u>.

2.5.1. Loan Advances paid directly to the Borrower shall be made in equal monthly payments if requested by Borrower.

2.5.2. Monthly payments shall be calculated for either the term payment plan or the tenure payment plan, as requested by Borrower.

2.5.3. Monthly payments under the term payment plan are made only during a term chosen by the Borrower and shall be calculated so that the sum of (i) or (ii) added to (iii), (iv), (v) and (vi) shall be equal to or less than the Principal Limit at the end of the term:

(i) Initial Advances under Section 2.2., plus any servicing fee set aside under Subsection 2.3.4., or

(ii) The outstanding principal balance of the Loan at the time of a change in payments under Sections 2.8. and 2.9. plus any servicing fee set aside under Subsection 2.3.4., and

(iii) The portion of the Principal Limit set aside as a line of credit under Section 2.7., including any set asides for repairs (Subsection 2.3.2.) and first year property charges (Subsection 2.3.3.), and

(iv) All monthly payments due through the payment term, including funds withheld for payment of property charges under Section 2.10., and

(v) All mortgage insurance premiums, or monthly charges due to the Secretary in lieu of mortgage insurance premiums, which are due through the payment term, and

(vi) All interest through the payment term. The Expected Average Mortgage Interest Rate shall be used for this purpose.

2.5.4. Monthly payments under the tenure payment plan shall be calculated as in Subsection 2.5.3. as if there were a payment term with the number of months in the term equal to the sum of 100 minus the age of the youngest Borrower multiplied by 12, but payments shall continue until the loan becomes due and payable as provided in the Loan Documents.

2.5.5. Monthly payments shall be paid to Borrower on the first business day of a month beginning with the first month after closing.

2.5.6. Borrower has requested monthly payments as indicated on the attached payment plan (Exhibit 1). The payment plan may be changed by Borrower as provided in Sections 2.8. and 2.9.

2.6. Line of Credit without Monthly Payments.

2.6.1. Borrower can request Loan Advances under a line of credit payment plan in amounts and at times determined by the Borrower, if the Principal Balance of the loan after the Loan Advance is made is less than or equal to the applicable Principal Limit, excluding any portion of the Principal Limit set aside under Section 2.3.

2.6.2. Line of Credit payments shall be paid to Borrower within five business days after the mortgagee has received a written request for payment by Borrower.

2.6.3. Lender may specify a form for line of credit payment requests.

2.6.4. Lender shall provide Borrower with a statement of the account every time a line of credit payment is made. The statement shall include the current interest rate, the previous principal balance, the amount of the current Loan Advance, the current principal balance after the Loan Advance, and the current Principal Limit.

2.7. Line of Credit Combined with Monthly Payments

2.7.1. A Borrower may receive monthly payments under either a term or tenure payment plan combined with a line of credit, as indicated on the attached payment plan (Exhibit 1).

2.7.2. Subsections 2.6.2., 2.6.3. and 2.6.4. apply to a line of credit combined with term or tenure payments.

2.7.3. If Borrower combines a line of credit set aside with a term or tenure payment plan, the Principal Limit is divided into: (a) an amount for the line of credit payments, (b) an amount for monthly payments which shall be calculated under Subsection 2.5.3. or 2.5.4. and (c) an amount for a servicing fee set aside, if required by Lender under Subsection 2.3.4. Each part of the Principal Limit increases independently at the same rate as the total Principal Limit increases under Section 1.7. Borrower can request Loan Advances in amounts and at times determined by Borrower, if the requested amount is less than or equal to the difference between (a) the Principal Limit applicable to the line of credit set aside and (b) the portion of the outstanding Principal Balance attributable to draws on the line of credit, including accrued interest and mortgage insurance premium or monthly charge due to the Secretary, but excluding any portion of the Principal Limit set aside under Subsection 2.3.2. and 2.3.3.

2.7.4. Partial Prepayments. A Borrower receiving monthly payments in combination with a line of credit may specify to which account a partial prepayment is to be applied. If Borrower does not designate an account, Lender shall apply any partial prepayments to an existing line of credit or create a new line of credit.

2.7.5. Borrower has requested a line of credit set aside in the amount indicated on the attached payment plan (Exhibit 1).

2.8. Change in Payments Generally.

2.8.1. Whenever the Principal Balance of the loan is less than the Principal Limit, Borrower may change from any payment plan allowable under this Loan Agreement to another.

2.8.2. If Borrower requests that monthly payments be made after a change in payment plan, Lender shall recalculate future monthly payments in accordance with Subsections 2.5.3. or 2.5.4.

2.8.3. Lender may charge a fee not to exceed twenty dollars, whenever payments are recalculated and in any other circumstances in which Borrower is required to sign a form acknowledging a change in payment plan as provided in Subsection 2.8.5.

2.8.4. Loan Advances under a new payment plan shall be paid to Borrower in the same manner and within the time period required under Sections 2.5, 2.6. or 2.7. and Subsections 2.5.5. or 2.6.2.

2.8.5. Changes in the payment plan must be acknowledged by Borrower by signing a form containing the same information as the attached payment plan (Exhibit 1). Lender shall provide a copy of the form to Borrower.

2.9. Change in Payments Due to Initial Repairs.

2.9.1. If initial repairs after closing, made in accordance with the Repair Rider, are completed without using all of the repair set aside, Lender shall inform Borrower of the completion and the amount then available to the Borrower to be drawn under a line of credit.

2.9.2. If initial repairs after closing, made in accordance with the Repair Rider, cannot be fully funded from the repair set aside, any additional Loan Advances needed to complete repairs shall be made in the manner provided under Section 2.16.

2.9.3. If initial repairs are not completed when required by the Repair Rider, Borrower shall not request and Lender shall not make any further payments, except as needed to pay for repairs required by the Repair Rider. In order to complete the required repairs, Loan Advances shall be made first from the repair set aside, and then in the manner provided under Section 2.16.

2.10. Payment of Property Charges.

2.10.1. Borrower has elected to require Lender to use Loan Advances to pay property charges consisting of taxes, hazard insurance premiums, ground rents and assessments if indicated on the attached payment plan (Exhibit 1). Borrower may change this election by

notifying Lender and at that time Lender shall pay to Borrower any amounts withheld from the Loan Advances to pay property charges.

2.10.2. If Borrower has made the election under Subsection 2.10.1. and Borrower is receiving monthly payments, Lender shall withhold amounts from each monthly payment and use the amounts withheld to make timely payments of property charges. The amounts withheld shall be calculated as provided in Subsection 2.10.3. Amounts withheld from monthly payments shall not be treated as Loan Advances and shall not bear interest except to the extent actually disbursed by Lender.

2.10.3. Lender shall withhold from each monthly payment an amount to pay any (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for fire, flood and other hazard insurance required by the Security Instrument. Each monthly withholding for items (a), (b) and (c) shall equal one-twelfth of the annual amounts, as reasonably estimated by Lender. The full annual amount for each item shall be paid by Lender before an item would become delinquent. Lender shall add the amounts for items (a), (b) and (c) to the Principal Balance when paid. If at any time the withholding for item (a), (b) or (c) exceeds the amount of actual property charges Lender shall pay the excess withholding to Borrower and add it to the Principal Balance. If the total of the withholdings for item (a), (b) or (c) is insufficient to pay the item when due, the amount necessary to make up the deficiency on or before the date the item becomes due shall be paid as a Loan Advance in the manner provided under Section 2.16.

2.10.4. If Borrower has made the election under Subsection 2.10.1. and Borrower is not receiving monthly payments, Lender shall make Loan Advances under the line of credit payment plan as needed to make timely payments of property charges, provided that no such Loan Advance shall exceed the amount permitted by Section 2.6.1.

2.10.5. If Borrower fails to pay the property charges in a timely manner, and has not elected to have Lender

make the payments, Lender shall pay the property charges as a Loan Advance as required under Section 2.16. If a pattern of missed payments occurs, Lender may establish procedures to pay the property charges from Borrower's funds as if Borrower elected to have Lender pay the property charges.

2.10.6. Lender shall immediately notify any Borrower who has made the election under Subsection 2.10.1. whenever Lender determines that amounts available from monthly payments or line of credit payments will be insufficient to pay property charges.

2.11. Insurance and Condemnation Proceeds. If insurance or condemnation proceeds are awarded, as provided for in the Security Instrument, (and the insurance proceeds are not applied to restoration or repair of the damaged property), the Principal Balance shall be reduced by the amount of the proceeds and the available loan funds shall be recalculated. At the same time the Principal Limit also shall be reduced by the amount of the proceeds.

2.12. Interest.

2.12.1. Interest shall be calculated as provided in the Loan Documents.

2.12.2. Interest shall accrue daily and be added to the principal balance as a Loan Advance at the end of each month.

2.13. Mortgage Insurance Premium (MIP); Monthly Charge.

2.13.1. Monthly MIP shall be calculated as provided in 24 CFR Part 206. If the Mortgage is held by the Secretary, a monthly charge shall be due to the Secretary and shall be calculated in the same manner as MIP.

2.13.2. The full amount of monthly MIP or monthly charge, including any portion of the MIP retained by a Lender under 24 CFR 206.109, shall be considered to be a Loan Advance to Borrower on the later of the first day of the month or the day Lender pays the MIP to the Secretary, if any MIP is due to the Secretary. In the event that the Note becomes due and payable or the Note is prepaid in full in the middle of the month, Lender may add the accrued MIP to the debt or

the Secretary may add the accrued monthly charge to the debt.

2.13.3. Any monthly charge due the Secretary shall be collected from Loan Advances.

2.14. Manner of Payment. For purposes of this Subsection "Borrower" shall not include any person who signed this Loan Agreement but who has a Principal Residence different from the Property. Only a Borrower has a right to receive Loan Advances. Borrowers shall choose to receive Loan Advances by either electronic funds transfer to a bank account designated by all Borrowers or by check mailed to an address designated by all Borrowers, except where all Borrowers agree that payment should be made directly to a third party for the benefit of the Borrowers. Borrowers may change the manner of payment by notifying Lender.

2.15. Protection of Property.

2.15.1. If Borrower vacates or abandons the property, of if Borrower is in default under Security Instrument, then Lender may make reasonable expenditures to protect and preserve the property and these expenditures will be considered Loan Advances as required under Section 2.16.

2.15.2. If Borrower fails to pay governmental or municipal charges, fines or impositions that are not included in Section 2.10. or if there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property. These expenditures will be considered Loan Advances as required under Section 2.16.

2.16. Unscheduled Payments. Loan Advances made pursuant to Sections 2.4., 2.9.2., 2.9.3., 2.10.3., 2.10.5., and 2.15. shall be made from a line of credit under Section 2.6. or 2.7. to the extent possible. If no line of credit sufficient to make the Loan Advances exists, any future monthly payments must be recalculated in accordance with Subsection 2.5.3. or 2.5.4.

Article 3 - Late Charge

3.1. Amount Due. Lender shall pay a late charge to the Bor-

rower for any late payment. If Lender does not mail or electronically transfer a scheduled monthly payment to Borrower on the first business day of the month or make a line of credit payment to Borrower within 5 business days of the date Lender received the request, the late charge shall be 10 percent of the entire amount that should have been paid to the Borrower for that month or as a result of that request. For each additional day that Lender fails to make payment, Lender shall pay interest on the late payment at the interest rate stated in the Loan Documents. If the Loan Documents provide for an adjustable interest rate, the rate in effect when the late charge first accrues shall be used. In no event shall the total late charge and interest exceed five hundred dollars. Any late charge shall be paid from Lender's funds and shall not be added to the unpaid principal balance.

3.2. Waiver. The Secretary may waive a late charge where the Secretary determines that the late payment resulted from circumstances beyond Lender's control and that no act or omission of Lender contributed to the late payment. At the time Lender requests a waiver, Lender shall inform Borrower that a waiver of late charge has been requested from the Secretary and that the late charge will be sent to Borrower if the waiver is denied. If the Secretary denies waiver, Lender shall pay to Borrower the late charge that accrued from the date the payment was late until the date the waiver was requested.

Article 4 - Termination of Lender's
Obligation to Make Loan Advances

4.1. Loan Due and Payable. Lender shall have no obligation to make Loan Advances if Lender has notified Borrower that immediate payment in full to Lender is required under one or more of the Loan Documents unless and until the notice is rescinded by Lender.

4.2. Loan Advances by Secretary. If the First Security Instrument has been assigned to the Secretary ~~or the Secretary~~ notifies Lender and Borrower that Loan Advances are secured by the Second Security Instrument, Lender shall have no further obligation to make Loan Advances under this Loan Agreement, unless the Secretary accepts later reimbursement by the Lender for all Loan Advances made, earned or disbursed by the Secretary. The Secretary may establish procedures for handling requests for payments and changes in payment plans during the interval between Lender's notification of intent to assign the First Security Agreement to the Secretary and completion of the assignment. Borrower shall be informed of such procedures by

Lender and/or the Secretary, and Borrower shall comply with such procedures.

4.3. <u>Lien Status Jeopardized</u>. If the Secretary or Lender determines that the first lien status of the Security Instrument or the second lien status of the Second Security Instrument is jeopardized because the Principal Balance equals or exceeds the maximum Principal Balance stated in the Security Instrument, or if the period since the first Loan Advance was made equals or exceeds the maximum period under which such advance can retain the status of a first lien under applicable state law, or if the Lender is otherwise prevented by applicable state law from making further Loan Advances secured by a first lien then the party making such determination, or the Lender if requested by the Secretary, shall obtain title evidence at Borrower's expense. If the title evidence indicates that the Property is not encumbered by any liens except the First and Second Security Instruments or other subordinated liens to the First and Second Security Instruments in a manner acceptable to Lender, then the Lender shall request Borrower to execute all documents prepared by Lender and approved by the Secretary to extend the first and second lien status to an additional maximum loan balance or an additional number of years. Lender shall also explain the principal provisions of the documents to Borrower.

Lender shall have no obligation to make Loan Advances if it determines on the basis of title evidence that the Property is encumbered by any liens that jeopardize the first lien status of the Security Instrument or the second lien status of the Second Security Instrument, or if the Borrower refuses to execute any document approved by the Secretary to extend the first and second lien status to an additional maximum Principal Balance or an additional number of years. Lender also shall have no obligation to take any of the steps described in this subsection if there are no available means under state law to continue making Loan Advances secured by a first lien. The failure or inability of Borrower to extend the First and Second Security Instruments to an additional maximum Principal Balance shall not make the loan due and payable.

4.4. <u>Bankruptcy</u>. Lender shall have no obligation to make Loan Advances on or following the date that a petition for bankruptcy of Borrower is filed.

4.5. <u>Mandatory Loan Advances</u>. Notwithstanding anything in Sections 4.1. through 4.4., all Loan Advances under Sections 2.10. (property charges), 2.12. (interest), 2.13. (MIP or

monthly charge), 2.15. (protection of property) or 2.3.4. (servicing fee) shall be considered mandatory Loan Advances by Lender.

4.6. Prepayment in Full. Lender shall not make Loan Advances if Borrower has paid the Note in full (or the second Note, if the Secretary has assumed the Lender's rights and obligations under Article 5.)

Article 5 - HUD Obligation

If the Lender has no further obligation to make payments to Borrower because of Section 4.2., the Secretary shall assume the rights and obligations of Lender under this Loan Agreement, except the Secretary shall not assume any obligation of paying flood, fire and other hazard insurance from Loan Advances. If the Secretary makes Loan Advances to Borrower under the Second Security Instrument, the portion of the Principal Limit available for Loan Advances shall be the difference between the current Principal Limit and the combined Principal Balances on the First Security Instrument less accrued interest and the Second Security Instrument.

Article 6 - Miscellaneous

6.1. Forbearance Not a Waiver. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

6.2. Successors and Assigns Bound; Joint and Several Liability; Co-Signers. The covenants and agreements of this Loan Agreement shall bind and benefit the successors and assigns of Lender. An assignment made in accordance with the regulations of the Secretary shall fully relieve the Lender of its obligations under this Loan Agreement. Borrower may not assign any rights or obligations under this Loan Agreement. Borrower's covenants and agreements shall be joint and several.

6.3. Notices. Any notice to Borrower provided for in this Loan Agreement shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the property address shown on the First and Second Instruments or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice to the Secretary shall be given by first class mail to the HUD Field Office with jurisdiction over the Property or

any other place designated by the Secretary. Any notice provided for in this Loan Agreement shall be deemed to have been given to Borrower, Lender or the Secretary when given as provided in this Section.

6.4. Governing Law; Severability. This Loan Agreement shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Loan Agreement conflicts with applicable law, such conflict shall not affect other provisions of this Loan Agreement which can be given effect without the conflicting provision. To this end the provisions of this Loan Agreement are declared to be severable.

6.5. Copies. Lender, Borrower and the Secretary shall each receive one original executed copy of this Loan Agreement when signed by the Secretary.

6.6. When Agreement Becomes Binding. This Loan Agreement shall bind Lender and Borrower when both Lender and Borrower have signed, whether or not the Secretary signs this Loan Agreement. This Loan Agreement shall bind the Secretary only when and if a Mortgage Insurance Certificate is issued for the First Security Instrument.

BY SIGNING BELOW the parties accept and agree to the terms contained in this Loan Agreement and the exhibits executed by the parties.

Etta E Malinou (SEAL)
Borrower Etta E. Malinou

_______________________________(SEAL)
Borrower

Rhode Island Housing and Mortgage Finance Corporation
By: Nicolas P. Retsinas (SEAL)
Nicolas P. Retsinas
Executive Director

Secretary of Housing and Urban Development

By: _______________________________(SEAL)

2234J